UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Daniel Martel**

    **v.**                                    Civil No. 13-cv-48-PB
                                          Opinion No. 2013 DNH 157

**U.S. Social Security Administration,
Commissioner**


MEMORANDUM AND ORDER

    Daniel Martel seeks judicial review of a ruling by the
Commissioner denying his application for disability insurance
benefits ("DIB") and supplemental security income ("SSI").
Martel claims that findings of the Administrative Law Judge
("ALJ") regarding his residual functional capacity ("RFC") and
his ability to perform past relevant work are not supported by
substantial evidence.  For the reasons set forth below, I deny
Martel's request and affirm the decision of the Commissioner.


I.    BACKGROUND[1]

A.   **Procedural History**

    Martel applied for DIB and SSI on June 28, 2008, alleging a
disability onset date of April 23, 2006.  After the Commissioner
denied his application, Martel requested a hearing before an

---

[1] The background information is taken from the parties' Joint
Statement of Material Facts (Doc. No. 11).  Citations to the
Administrative Transcript are indicated by "Tr."

ALJ, which was held on February 18, 2010.  Martel was represented by an attorney and testified at the hearing, but no medical or vocational expert ("VE") testified.  On April 22, 2010, the ALJ issued a decision finding that Martel was not disabled under the Social Security Act.  On July 26, 2010, the Social Security Decision Review Board, after reviewing Martel's claim, remanded the case to the ALJ to hold a second hearing and further develop the record.

On June 16, 2011, the ALJ held a second hearing.  Martel, again represented by an attorney, testified, as did a medical expert and VE.  On July 28, 2011, the ALJ issued his decision, again finding Martel not disabled.  On December 3, 2012, the Appeals Council denied Martel's request for review, making the ALJ's decision the Commissioner's final decision and therefore subject to judicial review.

B.  **Medical History**

Martel was fifty-two years old on his alleged onset date. From roughly 1977 to 1995, he worked as a machine operator. After his employer closed its facility, Martel worked as a general laborer through various temporary employment agencies from 1995 until 2006.  During this period, he worked as a machine operator, fabrics layer, and mail sorter, among other positions.  Tr. at 280.  Martel claims that he became disabled

in 2006 due to both physical and mental impairments.

1.   Alleged Physical Impairments

In August 2002, Martel underwent a liver biopsy for
hepatitis C, resulting in a final diagnosis of "chronic
hepatitis C with grade 3 activity and stage 3 fibrosis."[2]  In a
consultative examination with Dr. Darlene Gustavson, Psy.D.,
Martel reported that hepatitis had never interfered with his job
functioning.  Tr. at 342.  Dr. Gustavson included a diagnosis of
hepatitis B and C in her final report.  Dr. John Newcomb also
noted Martel's history of hepatitis.  In March 2011, nurse
practitioner Jill St. George ordered further laboratory testing
for Martel's hepatitis.  At his February 18, 2010 hearing,
Martel was questioned by his attorney about his hepatitis.  He
reported that he had the disease, but expressed uncertainty as
to what treatments he received.  Tr. at 35.  During his June 16,
2011 hearing, Martel noted that he had once undergone treatment
for five months, but stopped when it made him sick.  Tr. at 61.

2.   Alleged Mental Impairments

a.   **Treatment Notes**

From at least March 2006 through December 2009, Martel was

---

[2] Chronic hepatitis C is a viral liver disease that often
progresses to cirrhosis.  Stedman's Medical Dictionary 875-76
(28th ed. 2006).  Fibrosis is the "[f]ormation of fibrous tissue
as a reparative or reactive process."  Id. at 726.

3

treated by Leslie Clukay, a nurse practitioner at the Mental
Health Center of Greater Manchester.  Clukay's treatment notes
from this period consistently refer to Martel as "anxious" and
note that his speech was hesitant on several visits.  At times,
Martel's mood was described as "euthymic" or "not depressed."[3]
Medication lists show that Martel frequently took Zoloft, though
in February 2009 he switched to Citalopram after complaining
about Zoloft's ineffectiveness.[4]  In July 2009 Clukay
discontinued Citalopram and switched Martel back to Zoloft.

On a visit in September 2006, Martel denied having
depressive symptoms and reported feeling "really good," but was
noted to be quite anxious at baseline.  In January 2007, Martel
reported that he wanted to work but was limited by his inability
to drive.  In September 2007, Martel expressed frustration with
his continuing job search.  Otherwise, he reported feeling "ok"

---

[3] Euthymia is a mental state involving "moderation of mood, not
manic or depressed," and can present as "joyfulness[ or] mental
peace and tranquility."  Id. at 678.

[4] Zoloft is prescribed for the treatment of, among other
conditions, social anxiety disorder, major depressive disorder,
and panic disorder.  Physicians' Desk Reference 2588 (61st ed.
2007).  Citalopram is used to treat depression, but can be used
off-label to treat anxiety and panic disorders.  See, e.g., I.
Varia & F. Rauscher, Treatment of Generalized Anxiety Disorder
with Citalopram, 17 Int'l Clinical Psychopharmacology, May 2002,
at 103-07 (clinical study finding that Citalopram may be an
effective treatment for generalized anxiety disorder).

and that his medication was "fine."  Tr. at 322.  Clukay observed no evidence of depressive or panic symptoms, but noted that Martel's affect was flat.  Id.  Martel reported continuing frustration with his job search and unemployment in January 2008, at which point he also reported panic upon leaving his house.  In May 2008, Martel reported continuing to avoid crowds and social situations and requested a decrease in his medication dosage to alleviate a side-effect of excessive sweating.

In February 2009, Martel reported being more anxious and that his medication was not working.  At this point, Clukay characterized Martel's mood as "anxious, not depressed."  Tr. at 38.  During a follow-up appointment in May, Martel said that the medication made him less anxious and that his mood had stabilized.  Clukay found Martel's attention span and concentration to be normal, his memory intact, his mood euthymic, and his affect very anxious.  In July 2009, Martel reported that he had ceased taking medication due to its ineffectiveness and reported increased depressive and anxious symptoms.  Clukay observed that Martel's memory was intact and attention span and concentration were normal, though he was anxious and preoccupied.  She discontinued Citalopram and again prescribed him Zoloft.  In August 2009, Clukay noted that Martel reported "increased depressive symptoms."  Tr. at 383.

5

### b.   Consultative Examinations and Opinions

#### i. Dr. Darlene Gustavson

On August 29, 2008, Dr. Gustavson conducted a consultative psychological evaluation of Martel.  Martel rode his bicycle to the appointment, explaining that he had lost his driver's license in 2006 for a second DUI offense and did not wish to reinstate it.  Dr. Gustavson, noting Martel's profuse sweating, facial expressions, and hand-wringing, observed that he appeared extremely anxious.  Martel often answered questions slowly and vaguely, especially concerning alcohol consumption.  When he began answering questions honestly, he appeared less anxious. Martel acknowledged drinking two beers before the eleven a.m. evaluation and reported that he drinks at least ten beers per day "to face the world".  He admitted to drinking heavily since his early twenties.

Assessing his own mental condition, Martel reported depression beginning in childhood and described his symptoms as chronic, including never being happy; feeling worthless, helpless, apathetic, fatigued, and socially isolated; having passive suicidal thoughts; sleeping excessively; and having a decreased appetite when drinking.  He also reported anxiety since childhood, manifesting in symptoms including avoiding social situations, discomfort in conversation, nervousness, and

hand-wringing.  Martel stated that he felt safe when by himself
and nervous when outside his home.  When nervous, he reported
excessive sweating, which in turn only made him more self-
conscious.  Martel reported that he had been seeing a
psychiatrist quarterly since the 1990s, that he was currently
prescribed Zoloft, and that he had never been psychiatrically
hospitalized.

Martel also discussed his family, social, and environmental
history.  He reported living with his father, brother, and
brother's girlfriend.  He described a positive relationship with
his family, but noted no other significant intimate
relationships.  Martel dropped out of school after ninth grade,
but later obtained his GED.  While in school he was not enrolled
in special education programs, but reported a history of
learning difficulties and assessed himself as a "slow learner."

Martel reported that he previously worked at Anchor
Electric, beginning as a spot welder before working as a metal
cutter for seventeen years.  After the company went out of
business in 1995, Martel held only temporary positions.  He
reported that his most recent job involved stacking pallets,
where he was let go after six weeks for being too slow.  Dr.
Gustavson noted that his dismissal, in 2006, coincided with the
loss of his driver's license, and that the lack of

transportation played a role in his failure to find another position.  Describing his work history, Martel reported no reprimands or warnings and claimed that he was able to follow instructions, communicate with supervisors, and maintain attendance.

Assessing Martel's mental status, Dr. Gustavson first noted his appropriate hygiene but disheveled appearance.  Martel's motor activity was jittery and anxious, and his speech was delayed at times, which Dr. Gustavson reasoned was due to anxiety and difficulty with comprehension.  Dr. Gustavson noted, however, that Martel's articulation and speech were normal, his language comprehension appeared intact, and his affect was appropriate.  Martel's mood was anxious, but as he became less nervous, he stopped sweating, relaxed his posture, and laughed and smiled.  Dr. Gustavson noted that Martel was anxious and his judgment and insight were limited, but she found him to be cooperative, with logical thought processes and normal thought content.

Dr. Gustavson placed Martel's intellectual functioning in the low-average to average range, with suspicions of a learning disability.  Martel scored in the normal range with a 27/30 on

8

the Folstein Mini-Mental Status Examination.[5]

Martel then recounted his typical day: waking up at ten a.m., drinking beer, reading the newspaper to search for jobs, completing household chores such as mowing the lawn, eating a meal prepared by his father, taking medications, attending appointments as needed, watching television, playing guitar, and going to bed between 10:00 p.m. and 2:00 a.m. after drinking as many as ten beers.  No social activities were reported, though Gustavson noted that Martel did not require assistance to attend to his personal affairs, go shopping, cook, use public transportation, pay bills, maintain his residence, or care for his personal hygiene.

Assessing Martel's current level of functioning, Dr. Gustavson opined that he was able to understand and remember instructions, to sustain attention and complete tasks, and to tolerate stresses common to a work environment, including the ability to make decisions, maintain attendance, and interact with supervisors.  Concerning social functioning, Dr. Gustavson opined that Martel was unable to interact appropriately and

---

[5] The Folstein Mini-Mental Status Examination is a test commonly used to grade a patient's cognitive state.  Marshal F. Folstein et al., "Mini-Mental State": A Practical Method for Grading the Cognitive State of Patients for the Clinician, J. Psychiatric Res., Nov. 1975, at 189-98.  The mean score for "normal" individuals is 27.6.  Id. at 191.

communicate effectively with unfamiliar people.  She recommended
that Martel continue mental health treatment and begin a
rehabilitation program.  Dr. Gustavson diagnosed Martel with
physiological alcohol dependence, generalized social phobia, and
hepatitis B and C.

ii.   Dr. John Newcomb

On January 28, 2010, Martel underwent a consultative
psychiatric examination with Dr. Newcomb.  Martel reported
taking Zoloft but believed it to be ineffective.  He admitted
past difficulty with alcohol, but claimed to have ceased
drinking in 2007.  Martel's brother drove him to the examination
due to Martel's claimed inability to drive himself as a result
of anxiety and confusion.

Dr. Newcomb noted that Martel appeared disheveled, but
oriented to time, place, and person.  He reported that Martel
had a depressed mood, blunted affect, and admitted to crying
spells.[6]  Dr. Newcomb found that Martel had poor concentration
and "disturbed" memory, with frequent thoughts of suicide but no
plans to act on them.  He described Martel's speech as rambling,
but not indicative of delusions.  Martel reported having

---

[6] Blunted affect is "a disturbance in mood seen in schizophrenic
patients manifested by shallowness and a severe reduction in the
expression of feeling."  Stedman's Medical Dictionary, supra
note 2, at 34.

frequent panic attacks when in crowds or away from home and was
frequently housebound as a result.

Describing his daily activities, Martel reported typically
waking up at 5:00 a.m. after poor sleep, then spending most of
the day in bed watching television.  He reported that he never
accomplished much, forewent basic hygiene, and rarely left the
house.  Dr. Newcomb analyzed Martel as withdrawn and avoidant of
others and diagnosed him with major depressive disorder, panic
disorder with agoraphobia, and alcohol abuse in full sustained
remission.  He noted that Martel had high stress and assigned
him a Global Assessment of Functioning (GAF) score of 40.[7]

Dr. Newcomb next found that Martel's depressive disorder
met listing 12.04,[8] opining that his difficulties were "marked"

_____

[7] A GAF score of 40 indicates major impairments in several areas.
See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of
Mental Disorders 34 (4th ed. text rev. 2000).  The SSA has
remarked that the GAF Scale "does not have a direct correlation
to the severity requirements in our mental disorders listings,"
Revised Medical Criteria for Evaluating Mental Disorders and
Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21,
2000), and the American Psychiatric Association no longer
recommends use of the GAF Scale due to "its conceptual lack of
clarity . . . and questionable psychometrics in routine
practice."  Am. Psychiatric Ass'n, Diagnostic and Statistical
Manual of Mental Disorders 16 (5th ed. 2013).

[8] The third step of an ALJ's sequential evaluation, 20 C.F.R. §
404.1520(a)(4)(iii), considers an impairment's medical severity
by examining if it meets the criteria found in the SSA's
"Listing of Impairments."  Listing 12.04 discusses "Affective
Disorders," including disturbances of mood and depressive

in each category, and that he suffered repeated episodes of decompensation.  Dr. Newcomb also found that Martel's panic disorder met Listing 12.06 for Anxiety Related Disorders, again with marked difficulties and repeated episodes of decompensation due to anxiety, recurrent severe panic attacks, fear, terror, and a sense of impending doom occurring on the average of at least once a week.  Based on his own examination and review of treatment records indicating large doses of antidepressant medication, Dr. Newcomb opined that it was "more likely than not" that Martel had suffered from debilitating panic and major depressive disorders since April 13, 2006.  Tr. at 371.  Dr. Newcomb also completed a medical source statement for Martel, finding a host of "marked" limitations, including at least one in each listed category: understanding and memory; sustained concentration and persistence; social interaction; and adaptation.[9]  Repeating his diagnoses, Dr. Newcomb added clinical findings of "depressed mood, poor concentration, crying spells,

---

syndrome.  20 C.F.R. pt. 404, subpt. P, app. 1.  To qualify under Criteria A, one needs at least four symptoms, and Dr. Newcomb found that Martel had seven.  One must also qualify under Criteria B, with at least two areas of marked difficulty or one area of marked difficulty and repeated episodes of decompensation.  Id.  Dr. Newcomb found that Martel had marked difficulties in each area and repeated episodes of decompensation.

[9] According to Dr. Newcomb, Martel had marked limitations in thirteen of twenty categories.  Tr. at 367-68.

insomnia, suicidal ideation, frequent panic attacks, chronic daily anxiety, and impaired memory."

### iii. Nurse-Practitioner Clukay's Opinion

On March 3, Clukay completed a medical source statement finding that Martel had "marked limitations" in nine of twenty possible categories.  Clukay diagnosed Martel with a severe, generalized anxiety disorder as well as panic and mood disorders, with symptoms including heart palpitations, extreme sweating, tremors, agitation, restlessness, poor eye contact, and difficulty maintaining focus.  She opined that Martel's symptoms were persistent, lifelong, and significantly impaired his social functioning and ability to sustain a normal work routine.

### c.   Physical Examinations

In March 2011, nurse practitioner Jill St. George examined Martel.  During the examination, Martel complained of fatigue, weakness, anxiety, and depression.  St. George noted a normal mood, affect, attention span, and concentration.  She characterized Martel's depression as stable and noted that he was treated with Zoloft.

### d.   State Agency Assessments

On September 16, 2008, Edward Martin, Ph.D., a state agency psychologist, reviewed the available evidence and completed a

13

Psychiatric Review Technique form.  Dr. Martin opined that
Martel had mild restrictions in activities of daily living,
moderate difficulties in social functioning, moderate
difficulties in maintaining concentration, persistence, or pace,
and no extended episodes of decompensation.  Dr. Martin also
completed a mental RFC assessment, finding Martel capable of
remembering locations and work-like procedures and carrying out
instructions without special supervision.  He opined that Martel
could maintain a normal schedule and attendance, as well as pay
attention and maintain concentration.  He found that Martel
could complete a normal work week without an unreasonable number
of interruptions, ask simple questions and request assistance,
and accept both changes in work settings and instructions and
criticism from supervisors.  In his RFC assessment, Dr. Martin
noted one particular limitation: Martel should avoid work with
strangers and the general public.

C.    **Hearings and Other Testimony**

      1.   Function Report

      On July 14, 2008, Martel completed a function report in
which he described spending his days reading the newspaper and
help-wanted advertisements, watching television, and applying
for jobs.  He reported no problems in caring for himself, though
he occasionally forgot to take his medicine.  Martel stated that

his father cooked his meals, but that he did chores, including laundry and lawn mowing.  He reported that he could go out alone to the store, to doctors' appointments, and to submit job applications, and that he either walked or rode a bicycle after his second DUI offense.  He reported having no hobbies or social activities.

Martel noted difficulties getting along with others due to his quiet nature, but that he could follow written instructions if not under stressful time deadlines and spoken instructions provided they were well-explained.  Martel reported getting along well with authority figures and described being fired or laid off either because he sweated too much, did not talk enough, or worked too slowly.  He denied having any unusual behaviors or fears.

2.  <u>June 16, 2011 Hearing</u>

a.  **Martel's Testimony**

Martel testified that he lived with his brother and his brother's girlfriend, and that from January through April 2011 he worked making gaskets for automobiles.  He stated that his slow pace led to several "write-ups" and that he quit before being fired.  Martel denied having physical problems performing the job, but testified that anxiety and panic attacks prevented him from getting another job.

Martel also noted that he was uninsured and thus had not taken Zoloft in the past year, but planned to resume taking it. He found the drug was largely ineffective, and reported being nervous in public places even when taking Zoloft.  He diagnosed himself with an anxiety disorder and clinical depression.  Tr. at 58.  Martel testified to spending a typical day in his room watching television, only leaving the house to attend appointments or buy alcohol.  Martel acknowledged drinking ten to fifteen beers per day.  In the past he had attempted to quit drinking, with his longest period of sobriety lasting about six months.  When asked if he was capable of working, he replied, "I'm not sure.  I hope so, but I'm not sure."  When asked what would prevent him from working, he stated, "It would be anxiety and panic attacks."  Tr. at 62.

### b.    Medical Expert Testimony

Dr. Herbert Golub, a licensed clinical psychologist and testifying medical expert, opined that Martel likely had an anxiety disorder, and suggested it was inappropriate to treat it with Zoloft.  Dr. Golub was unable to determine how Martel's symptoms were affected by alcohol consumption.  He opined that Martel's anxiety did not meet listing 12.06 and that Martel exhibited mild limitations in activities of daily living, moderate limitations in both social functioning and maintaining

concentration, persistence, and pace, and no extended episodes of decompensation.  When asked by Martel's attorney whether Martel "should avoid work with strangers," Dr. Golub responded that Martel should avoid working "with close contact with strangers."  Tr. at 71.

### c.  Vocational Expert Testimony

The VE identified Martel's past relevant work as a general laborer in a machine shop.  Noting that the Dictionary of Occupational Titles ("DOT") classifies the job as heavy and unskilled, the VE classified it at a medium exertional level based on his own experience placing people in the job and observing their performance.  Identifying Martel's other past relevant work as "machine operator 2," the VE testified that the job is defined as the lowest level of semi-skilled work, requiring from thirty days to three months to learn, and is performed at a medium exertional level.  The ALJ posed a hypothetical question to the VE, asking about an individual with an RFC permitting medium work with relatively simple instructions, routine tasks, and no interaction with the general public.  The VE testified that given this RFC, such an individual could perform Martel's past relevant work at both positions.  Tr. at 77.

D.   **ALJ's Decision**

Applying the five-step sequential process required for evaluating Social Security claims, see 20 C.F.R. § 404.1520(a)(4), the ALJ found at step one that Martel had not engaged in substantial gainful activity since April 23, 2006, his alleged onset date of disability.

At step two, the ALJ found that Martel had two severe impairments: an anxiety disorder and a substance abuse disorder. In explaining his finding, the ALJ noted Martel's history of panic attacks with depression since childhood and longstanding alcohol abuse.  Tr. at 12.  Acknowledging Martel's occasional claims to have ceased drinking, the ALJ noted the considerable evidence documenting Martel's continued alcohol abuse.

The ALJ also acknowledged Martel's diagnosis of hepatitis, but declined to find it a severe impairment.  In arriving at this finding, the ALJ noted Martel's own statement that hepatitis had never interfered with his job functioning, that he could not even recall his last recurrence of symptoms, and that he continued to drink alcohol.  Tr. at 12, 342.  The ALJ also highlighted Martel's conflicting evidence as to whether he ever sought treatment and emphasized that the medical evidence did not show any functional limitations to Martel's ability to do work-related activities.

18

At step three, the ALJ found that none of Martel's impairments met or medically equaled the listings.  Rather, the ALJ found only moderate restrictions concerning activities of daily living, though he did find that Martel frequently neglected to shave, bathe, and dress.  The ALJ also noted Martel's conflicting testimony and varied descriptions of his daily activities.

The ALJ assessed Martel's social functioning as moderately limited, noting Dr. Newcomb's observations that Martel was withdrawn, avoided others, and rarely left the house, and that Dr. Gustavson found Martel unable to interact appropriately or effectively communicate with unfamiliar people.  The ALJ also noted Martel's testimony that he only left his house to buy more alcohol.  He then found moderate limitations with Martel's concentration, persistence, and pace, noting that despite visible discomfort he was able to participate in a sixty-minute consultative examination without complaints.  The ALJ found no evidence of any extended episodes of decompensation.

The ALJ next found that Martel had an RFC to perform a full range of work at all exertional levels, with a nonexertional limitation of "simple, unskilled work with no interaction with the general public."  In making this finding, the ALJ stated that he considered all symptoms and opinion evidence and

assessed its consistency with objective medical evidence, making credibility findings whenever a symptom was unsubstantiated by the objective medical evidence.  Tr. at 12-13.

Next the ALJ found that medical evidence did not support the severity of Martel's alleged impairments.  Acknowledging that the record reflected a history of Martel's avoidance of crowds and social situations, he found that it did not indicate any further restrictions beyond his stated RFC.  Martel's mental status examinations were consistently within normal limits and he had sought employment throughout the relevant time period, thereby demonstrating focus, concentration, and that he considered himself capable of sustaining employment.  The ALJ observed that in January 2007, Martel indicated that an inability to drive caused his unemployment, with no mentioning of anxiety limiting his job search.  Martel, the ALJ noted, could have reinstated his license, but chose not to do so.

The ALJ noted that during a March 2011 medical examination Martel denied difficulty with concentration and demonstrated a normal mood and affect and normal attention span and concentration.  He also described  Martel's presentation at Dr. Gustavson's consultative examination and reported activities of daily living as consistent with the RFC limitations.

Turning to Dr. Newcomb's evaluation, the ALJ found

20

inconsistencies in Martel's testimony.  First, the ALJ noted Martel's testimony – credited by Dr. Newcomb – that he had been sober since 2007 as directly inconsistent with the bulk of the evidence.  The ALJ noted other seeming inconsistencies within Martel's testimony to Dr. Newcomb that contradicted both his function report and conversation with Dr. Gustavson.

The ALJ noted that Martel did not allege that his condition had worsened over time, and that during his prior principle employment he had no history of reprimands and was able to follow directions, communicate with supervisors, and maintain attendance.  The ALJ highlighted Martel's daily activities and found that he lost his last job after losing his driver's license, "which shows that he retains the ability to engage to some extent with coworkers and supervisors."  Tr. at 16.  "More importantly," the ALJ stressed that Martel's seeking work as part of his daily routine denoted confidence that he could, in fact, hold a job.  Finally, the ALJ found Martel's testimony undermined by inconsistencies regarding alcohol use.

The ALJ next assessed the medical evidence and gave reasons for the weight allocated to each opinion.  He gave "significant weight" to Dr. Golub's medical expert opinion, reasoning that Dr. Golub supported his opinion with medical evidence, reviewed the record in its entirety, and listened to and evaluated

Martel's testimony. The ALJ noted that Dr. Golub's findings were supported by both Dr. Gustavson's evaluation and Martel's self-reported activities of daily living. He stated that Dr. Golub referenced Martel's social anxiety and opined that Martel should "avoid work involving close contact with others."

The ALJ gave "great weight" to Dr. Gustavson's opinion, noting that she evaluated Martel over the course of a sixty-minute interview and that her conclusions were consistent with Martel's reporting of his daily activities in his own function report and other record evidence. The ALJ gave "moderate weight" to the state agency consultant, reasoning that Dr. Martin's findings were consistent with the record evidence but based on an incomplete record.

The ALJ gave "limited weight" to Dr. Newcomb's report as "neither consistent with the record or his own evaluation notes." Tr. at 17. Although Dr. Newcomb's report includes a medical history, the ALJ observed that Dr. Newcomb did not describe which, if any, medical records he reviewed in completing it. The ALJ also found that Dr. Newcomb relied on Martel's "not fully credible" subjective reports concerning his alcohol use. Further, Dr. Newcomb's report of activities of daily living were deemed inconsistent with those reported in Martel's own function report.

22

The ALJ also gave limited weight to Clukay's opinion as treating therapist.  In particular, the ALJ dismissed Clukay's findings concerning Martel's alleged inability to sustain a normal workday and workweek as conclusory and unsupported by her own treatment notes, which did not document missed appointments or chronic tardiness.  Tr. at 17.  In arriving at his decision, the ALJ also noted that Clukay was a non-acceptable medical source.

At step four, the ALJ found Martel capable of performing past relevant work as a "machine operator 2" and "general laborer."  The ALJ first noted Martel's past relevant work as a general laborer, finding that the position required a heavy exertional level as defined in the DOT, but medium as performed by Martel.  The ALJ noted that "based upon his experience and placement of people in this position, [the VE] believes that this work is generally performed at the medium exertional level."  Tr. at 18.  He further added that Martel performed the job at the medium exertional level and that to the extent that the VE's testimony was inconsistent with the DOT, the VE based it on his own professional experience.

The ALJ acknowledged the VE's testimony that the machine operator 2 position was "the lowest level of semi-skilled work." He then stated that "[i]n comparing the claimant's residual

functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually performed." Id. Due to Martel's ability to perform past relevant work, the ALJ found Martel "not disabled" under the Social Security Act.

## II.   STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner. My review "is limited to determining whether the ALJ used the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

Findings of fact made by the ALJ are accorded deference as long as they are supported by substantial evidence. Id. Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). If the substantial evidence standard is met, factual findings are

conclusive even if the record "arguably could support a
different conclusion." Id. at 770.  Findings are not
conclusive, however, if they are derived by "ignoring evidence,
misapplying the law, or judging matters entrusted to experts."
Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

The ALJ is responsible for determining issues of
credibility and for drawing inferences from evidence in the
record.  Irlanda Ortiz, 955 F.2d at 769.  It is the role of the
ALJ, not the court, to resolve conflicts in the evidence.  Id.

To determine whether an applicant is disabled, the ALJ
follows a five-step sequential analysis.  20 C.F.R. §
404.1520(a)(4).  In the context of a claim for social security
benefits, disability is defined as "the inability to do any
substantial gainful activity by reason of any medically
determinable physical or mental impairment" expected to result
in death or to last for a continuous period of not less than
twelve months.  20 C.F.R. § 404.1505(a).  The applicant bears
the burden, through the first four steps, of proving that his
impairments exist and preclude him from working.  Freeman v.
Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).


### III.  ANALYSIS

Martel presents several arguments in support of his

25

challenge to the ALJ's decision.  He argues that the ALJ's RFC is not supported by substantial evidence because the ALJ: (1) failed to make a severity determination for Martel's depressive disorder, and thus did not factor its limiting effects into the RFC; (2) failed to properly weigh Dr. Newcomb's and Clukay's assessments; (3) impermissibly found no severe impairment for hepatitis at step two of the sequential process; and (4) did not adequately account for the limiting effects of Martel's mental impairments in creating the RFC.

Martel also presents several arguments involving the ALJ's findings concerning Martel's ability to do past relevant work. First, Martel argues that the ALJ's flawed hypothetical questions to the VE did not accurately reflect Martel's RFC. Second, Martel argues that the VE's testimony concerning Martel's past relevant work is impermissibly contradicted by information contained in the DOT, and that the ALJ's failure to resolve any such inconsistency constitutes serious error.  I address each argument in turn.

A.    **Depressive Disorder and Weight of Medical Opinions**

Martel first argues that the ALJ committed serious error at step two by failing to make a severity determination for his alleged depressive disorder.  He acknowledges that such errors of omission are deemed harmless if the ALJ found at least one

severe impairment, proceeded through the sequential analysis, and properly evaluated any impairments deemed non-severe when assessing the claimant's RFC.  See Hines v. Astrue, No. 11-cv-184-PB, 2012 WL 1394396, at *12-13 (D.N.H. Mar. 26, 2012).  His argument, then, does not focus on step two, but rather on an allegedly flawed RFC's failure to adequately capture his depressive disorder and its related functional limitations.  To support his argument, Martel cites his diagnoses of major depression or related disorders by "numerous treating and examining sources."  Doc. No. 8.  Martel specifically argues that the RFC fails to account for Dr. Newcomb's and treating therapist Clukay's opinions and evidence.[10]

The Commissioner correctly notes that mere diagnosis of an impairment says nothing about its severity and is insufficient to establish disability.  Doc. No. 10-1.  Such findings are

---

[10] Martel also cites several additional sources, including nurse practitioner St. George's notes from his initial visit.  Tr. at 402-05.  St. George's notes relied upon Martel's self-reporting and earlier medical records and did not contain St. George's own diagnosis.  He cites a 2001 "new patient" visit to Ardell Currier, another nurse practitioner.  Currier noted a "longstanding history of panic attacks and depression since childhood," and described Martel as an "obviously anxious gentleman."  Currier diagnosed anxiety disorder, "rul[ing] out underlying depressive syndrome."  Tr. at 417.  The third citation, to Dr. Bannister, was from 2002 and concerned a "follow-up" visit for hepatitis C, only briefly mentioning Martel's treatment for anxiety and depression.  Tr. at 420. None of these citations actually involved a diagnosis for depression.

dispositive, reserved to the Commissioner and thus warrant "[no] special significance." 20 C.F.R. § 404.1527(d). The ALJ is clearly required to evaluate each of these opinions as part of "all of the relevant evidence." See Alcantara v. Astrue, 257 F. App'x 333, 335 (1st Cir. 2007) (citing 20 C.F.R. § 416.920(a), (c)). An ALJ cannot simply ignore the body of evidence opposed to his view. Dunn v. Apfel, No. CIV. 98-591-B, 1999 WL 1327399, at *8 (D.N.H. Dec. 10, 1999). There is no error, however, where the ALJ clearly considered a source's opinion and, after evaluating the record, including other acceptable medical sources supporting the opposite conclusion, he or she decided to discount the source's opinion. See Russell v. Barnhart, 2004 DNH 009, 24-25. The question, then, amounts to whether substantial evidence supports the relative weight given to each medical opinion.

Generally, an ALJ should give the greatest weight to the opinion of a claimant's treating source, less weight to an examining source, and the least weight to a non-examining source. See 20 C.F.R. § 404.1527(c). For all medical sources, the ALJ must assess certain factors listed in the regulations and provide "good reasons" for the weight given to any treating

source opinion deemed not controlling.[11] Sibley ex rel. Sibley v. Astrue, 2013 DNH 022, 16 & n.5 (citing Polanco-Quinones v. Astrue, 477 F. App'x 745, 746 (1st Cir. 2012)). Opinions from nurse practitioners such as Clukay are to be assessed as "other sources," and cannot be viewed as acceptable medical sources or treating sources. 20 C.F.R. § 404.1513(a)(1-2), (d); SSR 06-3P, 2006 WL 2329939, at *2 (Aug. 9, 2006). Moreover, "the fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source.'" Hines v. Astrue, No. 11-cv-262, 2012 WL 2752192, at *10 (D.N.H. Jul. 9, 2012).

In arriving at his RFC finding, the ALJ permissibly gave limited weight to the opinions of each individual diagnosing Martel with a depressive disorder. He afforded limited weight to Dr. Newcomb's evaluation and findings, describing them as "neither consistent with the evidence of record or his own evaluation notes." Tr. at 17. Dr. Newcomb did not describe

---

[11] The factors are: the length of the treatment relationship and frequency of examination; the nature and extent of the relationship; the extent to which medical signs and laboratory findings, and the physician's explanation of them, support the opinion; the consistency of the opinion with the record as a whole; whether the treating physician is a specialist in the field; and any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2-6).

which, if any, medical records he reviewed in assessing Martel.
He accepted Martel's self-reporting of his alcohol consumption,
where a review of the medical record would have quickly revealed
inconsistencies. Dr. Newcomb's diagnosis of "alcohol abuse in
full sustained remission" thus relied upon Martel's subjective
reports, which the ALJ deemed not fully credible. The ALJ also
found that Dr. Newcomb's description of Martel's activities of
daily living were inconsistent both with Dr. Gustavson's earlier
description and Martel's own description in his function report.

The ALJ also afforded limited weight to Clukay's opinion.
After acknowledging certain aspects of her opinion as consistent
with the record evidence, he noted that "her opinion that
[Martel] is unable to sustain a normal workday and workweek is
not supported by her treatment notes," and that it was unclear
upon what evidence she even based her opinion. He also noted
that her mental status exams of Martel were predominantly within
normal limits, and found that her opinion was not fully
supported by the record. An ALJ can permissibly give limited
weight to an opinion that is inconsistent with record evidence,
so long as the ALJ give examples of why he or she regards it as
such. See Robar v. Astrue, 2011 DNH 110, 17-18. Finally, he
noted that Clukay was a non-acceptable medical source.

In contrast, the ALJ gave "significant weight" to Dr.

30

Golub, the medical expert, reasoning that he supported his opinion by referencing the record medical evidence, was consistent with evidence reported by Martel and observed by Dr. Gustavson, and was able to both review the record in its entirety and listen to Martel's testimony.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 n.1 (1st Cir. 1988) ("It is within the [ALJ's] domain to give greater weight to the testimony and reports of [non-examining] medical experts . . ."); see also Agrusso v. Astrue, 2013 DNH 006, 25 (citing Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 130 (1st Cir. 1981)) (crediting opinion of a medical expert who reviewed the record in its entirety and testified at a hearing).  The ALJ gave "great weight" to Dr. Gustavson's consultative examination, finding that her report was consistent with other testimony and with her detailed observations of Martel.  The ALJ gave moderate weight to state agency consultant Dr. Martin, reasoning that his testimony was consistent but based upon an incomplete record.

The ALJ's assessment of opinions was thorough, reasoned, and in accordance with 20 C.F.R. § 404.1527(c)(2-6).  Martel argues that the RFC "directly contradicts" Dr. Newcomb's findings, but misses his mark because the ALJ properly discredited Dr. Newcomb's opinions.  Doc. No. 8.  The ALJ was

entitled to come to a contrary conclusion in light of the opinions' inconsistencies with the record evidence of daily living, their reliance upon the subjective complaints of the less than fully credible claimant, and their general inconsistency with the treatment notes.  See, e.g. Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991) (per curiam)(finding that ALJ is not required to accept the opinions of treating or examining physicians).

Furthermore, the ALJ properly considered depression when making his RFC finding.  He began his discussion with a blanket statement that he had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  Tr. at 13.  More to the point, he explicitly mentioned symptoms of depression.  At step two, he noted Martel's history of panic attacks with depression since childhood.  Tr. at 12.  He also cited Clukay's treatment notes referring to Martel's "depression and anxiety."  Tr. at 15, 383.  These symptoms were thus considered, and the diagnoses were permissibly disregarded. The ALJ found at least one severe impairment, proceeded through the sequential analysis, and properly evaluated the impairment when assessing the claimant's RFC.  See Hines, 2012 WL 1394396 at *12-13.  He need not do more.

32

**B.**    <u>**Severity Finding for Hepatitis**</u>

Martel raises several arguments to contend that substantial evidence does not support the ALJ's determination that Martel's hepatitis was not a severe impairment.  First, he argues that the ALJ impermissibly relied upon his own lay interpretation of medical evidence.  Second, he notes that the only "medical evidence" to support the ALJ's finding impermissibly came from a "single decision maker."  Third, he argues that any medical opinions relied upon were based on a materially deficient record, and that failure to obtain additional evidence from a medical expert thus requires remand.

Although an ALJ is generally not allowed to judge matters entrusted to experts or substitute his or her own views for uncontroverted medical opinions, see Nguyen, 172 F.3d at 35, he can permissibly render a commonsense judgment if "the claimant has such minimal physical impairment that [the impairment] obviously poses no significant exertional restriction." Baxter v. Astrue, 2008 DNH 220, 19, <u>rep. & rec. adopted</u>, 2008 WL 4452119 (D.N.H. Sept. 24, 2008) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17-18 (1st Cir. 1996)) ("If that evidence suggests a relatively mild physical impairment posing, to the layperson's eye, no significant exertional restrictions, then we must uphold the ALJ's finding .

33

. .").  Here, the ALJ discussed Martel's hepatitis at length and cited abundant evidence to support his finding that it imposed no significant exertional restrictions.  Tr. at 12.  Martel told Dr. Gustavson that his hepatitis never interfered with job performance, he could not even remember his last occurrence of symptoms, and he gave conflicting evidence as to whether he had ever received treatment for hepatitis.  The ALJ also noted that Martel had not offered any medical or other evidence showing that his hepatitis resulted in any work-related functional limitations.  Here, the ALJ relied upon Martel's own words, not his own lay inferences, in arriving at a permissibly commonsense judgment.  See Manso-Pizarro, 76 F.3d at 17.

Martel's argument about the ALJ's reliance upon a single decision maker[12] ("SDM") with no medical credentials is similarly unavailing.  As the Commissioner noted, the ALJ did not even cite the SDM in arriving at his decision.  Doc. No. 10-1.  Martel argues that the ALJ used the same language as the SDM, and that "[t]herefore, the court can reasonably infer that the ALJ, in this case, merely relied on [the SDM] or his own lay

---

[12] Single decision makers are authorized under 20 C.F.R. § 404.906(a) as a "testing modification" in several states, including New Hampshire, for streamlining the disability determination process.  Modifications to the Disability Determination Procedures, Disability Claims Process Redesign Prototype, 64 Fed. Reg. 47,218-01, 47,219 (Aug. 30, 1999).

opinion . . .".  Doc. No. 12.  As explained above, the ALJ
extensively discussed his reasons for finding Martel's hepatitis
to be non-severe, not one of which involved the SDM.  It is the
role of the ALJ, and not of this court, to make inferences,
weigh, and resolve conflicts in the evidence.  See Rodriguez,
647 F.2d at 222 (citing Richardson v. Perales, 402 U.S. 389, 399
(1971)).  The ALJ's finding that Martel's hepatitis was not a
severe impairment is a permissibly commonsense judgment
supported by substantial evidence.

## C.   Limiting Effects of Martel's Mental Impairments

At step three, the ALJ found that Martel had moderate
limitations in (1) concentration, persistence, or pace; (2)
social functioning; and (3) daily living.  In composing Martel's
RFC, the ALJ limited him to "simple, unskilled work with no
interaction with the general public."  Tr. at 13.  Martel argues
that the RFC's limitations do not adequately account for the
ALJ's step three moderate limitations in  either concentration,
persistence or pace, or social functioning.

To bolster this argument, Martel cites several cases that
he alleges find that a limitation to simple unskilled work, with
no interaction with the general public, does not adequately
account for moderate functional limitations.  See, e.g.,
Leighton v. Astrue, No. 07-142-B-W, 2008 WL 2593789, at *4 (D.

Me. June 30, 2008) (social functioning), rep. & rec. adopted, 2008 WL 2858817 (D. Me. July 22, 2008); Edwards v. Barnhart, 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005) (concentration, persistence, or pace).  Certain decisions by other courts have relied upon particular facts and evidence to arrive at such a conclusion; others, including those of this circuit, have not. See Quintana v. Comm'r of Soc. Sec., 110 F. App'x 142, 145 (1st Cir. 2004) (limit to unskilled work is appropriate when claimant's treating psychiatrist rated claimant's social functioning as "only 'moderately limited'" in most respects); Falcon-Cartagena v. Comm'r of Soc. Sec., 21 F. App'x 11, 14 (1st Cir. 2001)(claimant's mental impairments at most marginally affect available occupations where reports indicate moderate limitations in areas of functioning).  This court has cited these cases in finding that "medical opinions indicating that a claimant is at least moderately limited in the relevant areas can 'adequately substantiate' an ALJ's finding that the claimant can function in a work environment." Hines, 2012 WL 2752192, at *10 (citing Quintana and Falcon-Cartagena).

Martel also argues that the medical opinion evidence reflects limitations beyond mere interaction with the public, citing to not only Dr. Newcomb's opinion but also to those of Dr. Golub and Dr. Gustavson.  Specifically, Martel mentions Dr.

36

Gustavson's opinion that he "is not able to interact appropriately and communicate effectively with people he is unfamiliar with," Tr. at 345, and Dr. Golub's testimony that Martel "should avoid work with close contact with strangers." Tr. at 71.  Martel's attorney specifically asked Dr. Golub if he agreed that the claimant should avoid work with strangers. After Dr. Golub qualified the statement with "close contact," he explained that he meant "people that he would have to interact with and be around, have to cooperate with and be on a work team . . . ".  Tr. at 71.

These statements are open to interpretation, and the ALJ determined that Martel's RFC was consistent with the specific functional abilities mentioned by Drs. Gustavson and Martin. Tr. at 16-17.  The DOT indicated that Martel's prior work as a general laborer – which the ALJ found Martel could still perform at step four – involved a level of interaction with others that was "not significant."  See Dep't of Labor, Dictionary of Occupational Titles, No. 609.684-014.  Martel argues that Dr. Golub's testimony effectively excludes work with coworkers. Doc. No. 8.  The ALJ, however, properly drew reasonable inferences from the record evidence in arriving at his decision to limit Martel to no interaction with the public.  See Irlanda Ortiz, 955 F.2d at 769.  There was no error.

37

D.     __The ALJ's Step-Four Determination__

Martel also argues that the ALJ's findings at step four, made in reliance upon the VE's testimony, are not supported by substantial evidence.  Martel first questions whether his positions as a "general laborer" and "machine operator 2" constitute "past relevant work."  Alternatively, he submits several arguments faulting the ALJ's finding him able to perform his past relevant work.

According to Martel, neither position qualifies as "past relevant work" because both were performed more than fifteen years before the hearing.  Doc. No. 8; see 20 C.F.R. 404.1565(a) (limiting past relevant work to jobs performed in the past fifteen years).  Martel last worked as a machine operator in 1995, and he argues that the "laborer" position discussed by the ALJ and VE referred to a particular position also ending in 1995.

The record reveals other, more recent laborer positions that undermine this assertion.  On his work history report, Martel noted employment as a general laborer for various temporary employment agencies from 1995 through 2006.  Tr. at 280.  Moreover, the regulation Martel cites clearly allows an ALJ to depart from the fifteen year period.  See 20 C.F.R. § 404.1565(a) ("We do not _usually_ consider that work you did 15

38

years or more before [one's hearing] . . . . The 15-year guide
is intended to insure that remote work experience is not
currently applied." (emphasis added)); see also Lopez-Diaz v.
Sec. of Health & Human Servs., 673 F.2d 13, 14-15 (1st Cir.
1982) (affirming an ALJ's reliance on jobs occurring seventeen
years before alleged disability onset date and twenty-two years
before insured status expired).  Here, Martel worked as a
laborer within the past fifteen years.  Even had he not, it
would be reasonable for the ALJ to conclude that an unskilled
position would be unlikely to have changed significantly over
time.  See Khuu v. Apfel, 168 F.3d 499 (9th Cir. 1999)
(unpublished table decision) (finding it reasonable for the
Commissioner to have concluded that the work of a market vendor
was unskilled and "unlikely to have changed significantly over
time").

    Martel also argues that the VE's testimony is contrary to
the ALJ's RFC, and that the ALJ erroneously relied upon this
testimony in finding no disability.  The ALJ's RFC explicitly
limited Martel to unskilled work and did not find that he had
any transferable skills. The VE testified, however, that Martel
could do past relevant work as machine operator 2, which is
semi-skilled work.  The ALJ's acceptance of this testimony,
argues Martel, is facially inconsistent with the RFC.

The Commissioner concedes this error, and admits that the ALJ could not rely on this information as substantial evidence. Doc. No. 10-1.  The Commissioner nevertheless asserts that the ALJ permissibly relied upon the VE's testimony that Martel was able to perform his past relevant work as a general laborer, thereby rendering this mistake inconsequential.

Under the Social Security Act, Martel is not disabled if he is "[]able to do his previous work."  See 42 U.S.C. § 423(d)(2)(A); Dashnaw v. Astrue, 2011 DNH 178, at 15-16.  The ALJ, relying upon his RFC, permissibly found that Martel remained able to work as a general laborer, and thus found no disability.  That he also impermissibly relied upon the VE's testimony for the machine operator position is of no consequence.  See Gray v. Heckler, 760 F.2d 369, 371-72 (1st Cir. 1985) (finding an ALJ's reliance upon one prior instance of relevant, applicable past work to be sufficient, even if claimant can demonstrate an inability to engage in other prior work).

Martel finally argues that the ALJ erred in crediting the VE's testimony to the extent that it contradicted the DOT's occupational descriptions.  In describing Martel's past relevant work, the VE changed the laborer position's exertional level from heavy to medium, based on his "experience on [sic] having

40

placed people in the job and observing that job be performed."
Tr. at 74.  The ALJ incorporated a medium exertional level into
his hypothetical questions, id. at 76, and at step four
described the general laborer position as including a medium
exertional level "as performed by [Martel]."  Tr. at 18.  Martel
disagrees with the ALJ's explanation for changing the laborer
position's exertional level from heavy to medium, arguing that
the ALJ impermissibly relied upon the VE's testimony in creating
his hypothetical question, thereby tarnishing his later reliance
upon the VE at step four.

This argument is unavailing, as Martel's physical
exertional levels were not at issue.  After examining each of
Martel's symptoms and impairments, the ALJ found that Martel
"has the residual functional capacity to perform a full range of
work at all exertional levels."  Tr. at 13.  As discussed above,
this RFC was supported by substantial evidence.  Martel was thus
able to perform his past relevant work as general laborer either
at the DOT's heavy exertional level or at the VE's suggested
medium level.  See 20 C.F.R. §§ 404.1567(d)("If someone can do
heavy work, we determine that he or she can also do medium . . .
work.").  Any mistake is thus inconsequential, since Martel was
able to work at either a heavy or medium exertional level.

41

## IV.   **CONCLUSION**

For the foregoing reasons, I grant the Commissioner's motion to affirm (Doc. No. 10) and deny Martel's motion to reverse (Doc. No. 8).  The clerk is directed to enter judgment accordingly and close the case.

SO ORDERED

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

November 18, 2013

cc:   Francis M. Jackson, Esq.
      Karen B. Fitzmaurice, Esq.
      Robert J. Rabuck, Esq.